Jerry Mack DORROUGH, and Thomas James Patterson, Plaintiffs-Appellants.

v.

M. R. HOGAN, Warden, et al., Defendants-Appellees.

No. 77-1952
Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Dec. 1, 1977.

Rehearing and Rehearing En Banc Denied Jan. 9, 1978.

---

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir., 1970, 431 F.2d 409, Part I.

Jerry Mack Dorrough, pro se.

Thomas James Patterson, pro se.

Wm. L. Harper, U. S. Atty., Sherman D. Johnson, Asst. U. S. Atty., Atlanta, Ga., for defendants-appellees.

Before COLEMAN, GODBOLD and TJOFLAT, Circuit Judges.

## PER CURIAM:

This is a class action brought by prisoners, attacking on many grounds conditions in the Segregation Two unit of the federal penitentiary in Atlanta, Georgia. The District Court denied relief. We AFFIRM on the basis of the orders of the District Court which are appendices to this opinion.

### APPENDIX 1

### ORDER

This conditions suit, brought by a federal prisoner incarcerated in the segregation building at the Atlanta Federal Penitentiary, came on for trial on June 14 and 15, 1976, and after a viewing of the premises by a United States magistrate, the court is prepared to rule on plaintiff's substantive claims.

### The Class Issue

■ Although this suit was originally brought by plaintiff Dorrough and fellow-prisoner Thomas Patterson (who has since been dismissed as a named party) in their individual capacities, plaintiff Dorrough now seeks to have the action certified as a class action pursuant to Rule 23, Fed.R. Civ.P. Since the government has made no objection to such certification, and since this court specifically finds that the requirements of subsections 23(a) and 23(b)(2) have been fulfilled, the court hereby CERTI-FIES this as a class action with the class defined as all prisoners now incarcerated, or who will be incarcerated, in the second floor of the segregation building, otherwise known as "Seg. 2".

### The Merits.

■ Before this court addresses plaintiffs' claims, it should first clarify what issues are currently before the court. This is an action contesting the conditions of confinement of prisoners in Seg. 2; the court is not prepared to rule on the named plaintiff's particular claims against various prison officials relating to his alleged right to grow a beard, his right to have his publication "Quench Not the Spirit" photocopied as an exhibit in other civil actions, his right to receive veterans' educational benefits, his right to receive particular medical treatment at the prison hospital, and his right to receive visitors in the segregation building in the same manner as other segregated prisoners receive visitors. In addition, the court finds that the named plaintiff does not have standing to raise the claim of one or more individual prisoners to receive food prepared according to their religious die-

tary laws, or the right of certain holdover prisoners—those being held in Atlanta while awaiting transfer to other prisons—to be treated in a manner similar to the treatment of holdover prisoners in the general population.

The plaintiffs claim that their constitutional right to be free from cruel and unusual punishment and their right to receive equal protection under the law have been violated by the conditions of their incarceration in Seg. 2. Specifically, they claim that they do not receive adequate light and air, that the temperature in Seg. 2 is unbearably hot, that they do not receive the same meals as prisoners in the general population, that they do not receive sufficient exercise, that they are denied access to educational and work programs, and that they are not provided with the same visitation privileges as other prisoners.

■ The Fifth Circuit Court of Appeals has held that the courts must generally yield to the discretion of correction officials in the area of confinement, but that the general "adequacy of conditions of confinement of prisoners—such as medical treatment, hygienic materials, and physical facilities—is clearly subject to Eighth Amendment scrutiny," *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974). After a review of the evidence presented in this case, and after a viewing of the facilities, this court concludes that, with the exception of one area of concern, the prisoners incarcerated in Seg. 2 receive humane and constitutionally adequate treatment.

The Seg. 2 facility consists of one long corridor and seventeen separate cells. Seg. 2 is used primarily to house prisoners held in administrative detention[1] and holdover

---

1. According to Bureau of Prisons Policy Statement No. A–7400.5D(21):

"An inmate may be placed in Administrative Detention by persons designated by the Chief Executive Officer when his attitude and conduct indicate that his continued presence in the general population poses a serious threat to life, property, himself, staff, other inmates, or to the institution for the following reasons:

"a. Pending a hearing for violation of institution rules or regulations.

"b. Pending an investigation of possible violation of an institutional rule, but where charges have yet to be lodged.

"c. Pending investigation or trial for crimes committed in the institution.

"d. By inmate request for his own protection, or when the staff determines that admission to or continuation in Administrative Detention is necessary for the inmate's own protection.

"e. Is pending transfer or is in holdover status during transfer.

status. Each cell generally contains one to three prisoners and is generally eight feet in width and twenty feet in length. The facility also has a recreation room twenty-eight feet in length and fifty-four feet in width which contains a Universal gym, an all-purpose exercise machine. There is a shower room at the end of the corridor and there is an exercise yard outside the building. Each cell contains one toilet and sink, and a window of approximately twenty-eight square feet constructed of translucent glass bricks. The air temperature, as measured in April of 1976, was generally in the mid-70°'s range, and the air was of a comfortable, if slightly warm, temperature on the day of the viewing September 22, 1976. The light in each room is provided by way of the windows and fluorescent bulbs in the ceiling. Air is circulated throughout the floor by way of a vent system which allows air to enter through the top of each cell and to exit through a grille in each door. The air in the corridor is then pulled out of the facility by way of an exhaust fan. In addition, each cell has a small (approximately one square foot) vent in the translucent window. The cells each have approximately five complete air changes per hour, although five cells have over ten air changes per hour. These conditions, although certainly not as good as those experienced in the general population cells, are adequate and are not unduly uncomfortable. While the court has no doubt that temperature and humidity are higher in the hot summer months, the court believes that the current ventilation system is adequate to make the facility liveable. The use of translucent, rather than transparent, windows, is necessary to reduce breakage and to minimize surreptitious communication between segregation prisoners and those in the general population.

The food which the Seg. 2 prisoners receive comes directly from the food line serving the general prison population and is reheated by microwave ovens upon arrival at the segregation building. Although Seg. 2 prisoners, of necessity, do not have the same range of selection of food, and do not always have their choice of hot or cold beverage at each meal, the prison officials have made, and continue to make, a good-faith effort to satisfy the desires of the Seg. 2 prisoners.

■ The court found no credible evidence to support plaintiffs' claim that they were being denied adequate medical care. Except for the named plaintiff's own running feud with the medical staff, the court finds that there is no general feeling of discriminatory medical treatment among Seg. 2 prisoners. Moreover, each prisoner's, individual hygienic needs are adequately met by the facilities in each cell, and by access to the shower facilities at least two, generally three, times a week.

There is no television in Seg. 2, because of the impracticality of providing one in each cell and because of the security problems inherent in allowing all the Seg. 2 prisoners to view a television in one room. Each prisoner is provided with an AM/FM radio, however, although head phones are not permitted.

■ Because prisoners are placed in administrative detention to keep them away from other prisoners (see note 1, supra), the Seg. 2 prisoners are restricted in their movement. They are not generally allowed to participate in educational, work, or entertainment programs outside of the segregation building. Moreover, some Seg. 2 prisoners, such as the named plaintiff, are allowed to receive visitors only in the segregation building, and not in the general visiting lounge. Since prison officials must purchase goods for the Seg. 2 prisoners at

"f. Pending classification."
Those placed in administrative detention are to receive a review of their status seven days after incarceration in segregation, and are to be provided with a formal review with a hearing

every thirty days thereafter. A–7400.5D(23). No persuasive evidence was received at trial which showed that this schedule was not generally complied with.

the prison commissary, each prisoner is allowed only two general purchases each month. And since these prisoners cannot reach the law library, a reasonable amount of legal materials are brought to the prisoner upon request. Seg. 2 prisoners are also prohibited from attending religious services with the general population, but may receive clergy in segregation. The court finds that all these restrictions are a necessary part of prison security and do not amount to a denial of equal protection or an infliction of cruel and unusual punishment. They also comport with current Bureau of Prisons regulations.

The only aspect of segregation which truly concerns the court is the defendants' practice, in accordance with Bureau of Prisons Policy Statement No. A–7400.5D(27)(f), to limit segregated inmates to two one-hour exercise periods a week. While the court believes that the exercise facilities are adequate, it has some concern that the limitation on exercise periods may be inadequate to insure proper health. Several courts have held that daily exercise periods are a necessary part of prison maintenance, *see, e. g., Pugh v. Locke*, 406 F.Supp. 318, 332 (M.D.Ala.1976), *Rhem v. Malcolm*, 371 F.Supp. 594, 627 (S.D.N.Y.1974), *Osborn v. Manson*, 359 F.Supp. 1107 (D.Conn.1973), although one court has held that the two-hour restriction is not, in itself, cruel and unusual punishment when all other conditions of confinement are adequate, *Jordon v. Arnold*, 408 F.Supp. 869, 876–7 (M.D.Pa. 1976).

This court tends to agree with the court in *Jordon* when it held that a court order requiring daily exercise is appropriate when overall conditions are found to be substandard, but that an order requiring the prison officials to merely change their exercise schedule might be an unwarranted intrusion into an area governed by official discretion. Yet, the Fourth Circuit, when looking at the two-hour restriction in an otherwise constitutionally adequate facility, expressed this concern:

" * * * While a restriction of two exercise periods of one hour each during a week, as allowed by plaintiff, may not ordinarily transgress the constitutional standard as fixed by the Eighth Amendment if confined to a relatively short period of maximum confinement, the rule may be quite different when, as here, the restriction has extended already over a period of years and is likely to extend indefinitely for the balance of plaintiff's confinement." *Sweet v. South Carolina Dept. of Corrections*, 529 F.2d 854, 866 (1975).

Some of those incarcerated in Seg. 2 are, like the plaintiff in *Sweet*, held in segregation for their own protection, or to maintain prison security. Thus, their stay in segregation can be considered indefinite. Moreover, many of the prisoners who are placed in administrative detention pending investigations and hearings remain in segregation for several months. The named plaintiff has been in segregation for three-and-a-half years because of his refusal, allegedly for religious reasons, to shave his beard. The two-hour restriction, when coupled with this long-term confinement, thus raises a serious constitutional question.

The court in *Sweet* declined to make a final ruling on this matter and remanded the case to district court for additional findings on how the plaintiff's health might be affected by such restriction and on whether it would be feasible for prison authorities to provide him with more exercise. Before ruling on this matter, therefore, the court hereby ALLOWS the parties twenty (20) days to submit additional pleadings in the form of briefs and/or affidavits on the questions of health and practicality.

Plaintiffs' motion for issuance of a special order requiring further air measurements to be taken is DENIED.

The clerk is DIRECTED to resubmit the case for a final ruling on the merits in twenty (20) days.

So ORDERED, this _29_ day of September, 1976.

## APPENDIX 2

### ORDER

In its order of September 30, 1976, this court found that the overall conditions of confinement in the second floor of the segregation building at the Atlanta penitentiary (Seg. 2) did not amount to cruel and unusual punishment. The court did not enter a final order, however, since it expressed concern over the fact that segregation prisoners were allowed only two one-hour exercise periods a week. Before ruling on whether such a restriction constituted cruel and unusual punishment the court allowed the parties to submit additional pleadings on the questions of health and the practicality of additional exercise periods.

After a review of the additional pleadings, this court concludes that an order requiring a change in exercise periods from two days a week to three or five, or whatever, would be an unwarranted intrusion upon the Bureau of Prisons' discretion in this area, *see* Order of September 30, p. 6. The denial of additional exercise periods simply is not a sufficiently grave deprivation of bodily needs to trigger special injunctive relief from this court.

The court therefore CONCLUDES that the conditions in Seg. 2 do not constitute cruel and unusual punishment and that the plaintiffs are not entitled to any relief. Plaintiff Dorrough's motion for reconsideration of the September 30 order and his motion to show cause are DENIED. The clerk is DIRECTED to enter judgment for the defendants.

So ORDERED, this __28th__ day of January, 1977.